# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
)
**BRIAN F. SULLIVAN,**                                    )
                                                          )
       **Plaintiff,**                                )
                                                          )        **Civil Action No.**
       **v.**                                       )        **13-12907-FDS**
**CAROLYN COLVIN , Acting**                               )
**Commissioner, Social Security**                         )
**Administration,**                                       )
                                                          )
       **Defendant.**                                )
_____)

## MEMORANDUM AND ORDER ON MOTION FOR AN
## ORDER AFFIRMING THE DECISION OF THE COMMISSIONER

**SAYLOR, J.**

This is an appeal of a final decision of the Commissioner of the Social Security

Administration denying the application of plaintiff Brian Sullivan for Social Security Disability

Insurance ("SSDI") benefits and Supplemental Security Income ("SSI").  Plaintiff appeals the

Commissioner's denial of his claim on the ground that the decision is not supported by

"substantial evidence" under 42 U.S.C. §§ 405(g) and 1383(c)(3).  Specifically, he contends that

the administrative law judge (1) failed to weigh the evidence from medical source opinions

appropriately and made an improper finding of residual functional capacity; (2) failed to resolve

inconsistencies between the vocational expert testimony and the Dictionary of Occupational

Titles, as required by SSR 00-4p; and (3) made an improper credibility determination that is not

supported by substantial evidence.

Pending before the Court are plaintiff's motion to reverse or remand the decision of the

Commissioner and defendant's motion for an order affirming the decision of the Commissioner.

For the reasons stated below, the decision of the Commissioner will be affirmed.

I.    **Background**

Plaintiff Brian Sullivan was born on December 7, 1957, and raised in Quincy, Massachusetts. (A.R. 203, 375). He attended school through the eleventh grade and served in the U.S. Navy from 1977 to 1979 as an aircraft hydraulic technician. (A.R. 37, 479). He obtained his GED in 1979.

Sullivan worked as a carpenter from 1981 until 2007, when he injured his right wrist by punching a wall. (A.R. 52, 185, 194). He has not engaged in substantial gainful employment since the date of his injury. (A.R. 37-39, 193).

Sullivan also has a long history of psychiatric problems, including depression, generalized anxiety disorder, agoraphobia, bipolar disorder, paranoid schizophrenia, and alcohol dependence. (A.R. 39, 52).

A.    **Injury and Medical Evidence**

Sullivan injured his right wrist on January 15, 2007, when he punched a wall at a police station. (A.R. 25, 271). The injury occurred shortly after he had been laid off by Harrison Supply Company, where he worked as a carpenter and cabinet maker. (A.R. 57-58). Since the date of his injury, Sullivan has worked only infrequently on small carpentry projects and odd jobs ("a small deck or small porch, maybe a little painting") and snow removal. (A.R. 37-39). He was incarcerated from October 2007 to August 2008 after a conviction for operating under the influence. (A.R. 39).

After the injury, Sullivan experienced limited range of motion in his right hand, severe pain when lifting heavy objects or using his wrist repeatedly, and swelling in his wrist.  (A.R. 271).  While incarcerated, he complained of wrist pain when asked to perform labor.  (A.R. 58).

On February 7, 2008, Sullivan was examined by Dr. Adriana Carrillo at Lemuel Shattuck Hospital.  (A.R. 271).  Dr. Carrillo noted swelling of the wrist, decreased range of motion, and pain on contact.  (A.R. 271).  An x-ray revealed a nonunion scaphoid fracture. (A.R. 271).  Dr. Carrillo recommended surgery.  (A.R. 271).  On February 26, 2008, Dr. Carrillo performed an open reduction and internal fixation surgery of the right scaphoid with a right iliac crest graft and twin fix screw.  (A.R. 272).  Dr. Carrillo noted that Sullivan tolerated the surgery well and that there were no complications.  (A.R. 273).

Sullivan returned for a follow-up appointment on March 13, 2008, with radiologist Dr. Carlos Cunha.  (A.R. 275).  His x-rays showed a transverse fracture through the waist of the scaphoid, a single metallic screw across the fracture site, sclerosis involving the scaphoid bone compatible with avascular necrosis, and deformity of the fifth metacarpal consistent with prior fracture.  (A.R. 275).

On April 24, 2008, Sullivan saw Dr. Carrillo for a surgical follow-up appointment.  (A.R. 269).  Dr. Carrillo found no pain to palpation over the scaphoid area, but noted pain over the carpal tunnel area.  (A.R. 269).  She recommended that Sullivan remove his splint a few times per day and perform range-of-motion and grip-strengthening exercises, but refrain from heavy lifting, weightlifting, and push-ups or pull-ups.  (A.R. 269).

On June 12, 2008, Sullivan had additional follow-up appointments with Dr. Cunha and Dr. Carrillo.  (A.R. 266, 274).  Dr. Cunha noted that the fracture had completely healed, but that

the x-ray revealed increased sclerosis in the scaphoid bone, possibly representing avascular necrosis. (A.R. 266, 274). Dr. Carrillo found Sullivan to have decreased mobility of the wrist, but good dorsiflexion, normal distal neurovascular examination, and no pain to palpation over the scaphoid. (A.R. 26). She cleared Sullivan to engage in heavy lifting, weightlifting, push-ups, and pull-ups, and encouraged him to continue range-of-motion exercises. (A.R. 266).

On September 23, 2008, Sullivan went to Orthopedic Surgery & Rehab P.C. in Randolph, Massachusetts, complaining of wrist pain, weakness, and limited range of motion. (A.R. 325). An examination by Dr. Olarewaju Oladipo revealed localized tenderness over the surgical scar, diminished grip strength, and limited range of motion with flexion. (A.R. 325). A radiograph of the right hand showed a healed scaphoid. (A.R. 325). Dr. Oladipo recommended that he continue physical therapy. (A.R. 326).

Sullivan continued to see Dr. Oladipo through March 2010. (A.R. 314-326). Dr. Oladipo advised him to continue physical therapy, and repeatedly noted that his right wrist had limited extension and flexion, decreased grip strength, and tenderness, and noted that an additional surgery may be needed. (A.R. 325, 320, 322). On September 12, 2009, Dr. Oladipo concluded that Sullivan was "unfit to return to work" from September 12, 2009, to October 10, 2009. (A.R. 324). On March 30, 2010, Dr. Oladipo described Sullivan as having "chronic persistent pain" and recommended self-exercises, physical therapy, and further evaluation. (A.R. 314-315).

On May 20, 2010, Sullivan saw Dr. Marvin Rosen at Orthopedic Surgery of Quincy to complete his veterans' benefits eligibility form. (A.R. 310). Dr. Rosen diagnosed a right scaphoid fracture and post-traumatic osteoarthritis in his right wrist. (A.R. 310). Dr. Rosen gave

him a "poor" prognosis, stated that further surgery may be required in the future, and concluded that Sullivan is "permanently unable to work." (A.R. 310).

On June 29, 2010, Sullivan met again with Dr. Rosen, seeking a second opinion regarding his wrist. (A.R. 366). He presented with an aching sensation in his right wrist and reported that he had trouble holding a hammer and using a framing nailer at work. (A.R. 366). Specifically, he complained that his fingers locked on the hammer and had to be forcibly manipulated to release the hammer. (A.R. 366). Dr. Rosen found that Sullivan had developed joint narrowing and post-traumatic osteoarthritis in his wrist after his scaphoid fracture. (A.R. 366). Dr. Rosen concluded that he was likely to develop scaphoid lunate advanced collapse (SLAC) wrist. (A.R. 366). Dr. Rosen found that he probably could not work an eight-hour shift five days per week as a carpenter because repetitive activity, such as swinging a hammer or using a framing nailer, will substantially worsen his symptoms. (A.R. 366). Finally, Dr. Rosen noted that his injury was likely to be permanent and will only worsen over time. (A.R. 366).

On November 3, 2010, Sullivan received an occupational-therapy evaluation from Thomas Pappas, M.S., OTR/L. (A.R. 409). Pappas noted that Sullivan reported "persistent pain" in his right wrist. (A.R. 409). Pappas noted that Sullivan rated his pain at a level two out of ten while resting. (A.R. 408). The pain level increased to six out of ten with a "great deal of resistance" or a "full day of resistance," which was "unacceptable" to him. (A.R. 408-409). Pappas recommended use of a soft splint and hot-paraffin treatment for pain, and noted that ultimately another surgery may be required. (A.R. 409).[1]

On January 18, 2011, Sullivan began seeing Dr. George Dyer, an orthopedic surgeon.

_____

[1] At a visit in September 2011, Sullivan told Pappas that any range of motion of his right wrist resulted in pain that he rated at a level eight out of ten. (A.R. 812). Sullivan, however, described the pain as "acceptable." (A.R. 812).

(A.R. 272). Sullivan presented to Dr. Dyer with continuing wrist pain, limited range of motion, ulnar neuropathy, and cramping. (A.R. 727). Dr. Dyer examined him and found that his wrist fracture had healed well but that he still reported tenderness, and that he may have avascular necrosis, radioscaphoid arthritis, and ulnar neuropathy. (A.R. 728). Dr. Dyer recommended a computerized axial tomography (CAT) scan and an electromyography (EMG) test to measure electrical activity in the wrist muscles. (A.R. 728). Those tests were conducted in March 2011; the results were normal. (A.R. 716).

Sullivan returned to Dr. Dyer on August 16, 2011. (A.R. 825). Dr. Dyer noted tenderness around Sullivan's incision, and some discomfort flexing the wrist, which suggested radioscaphoid arthritis. (A.R. 825). Dr. Dyer also noted a possibility of intercarpal ligamentous injury and suggested surgery, but Sullivan stated that he was not interested in surgery at that time. (A.R. 824-25). On September 22, 2011, he returned to Dr. Dyer for a custom-fit volar thumb spica splint intended to reduce pain. (A.R. 21).

In addition to his physical-health problems, Sullivan has a history of mental illness and alcohol dependence. (A.R. 458). His first diagnosis of depression was in 1997, but his symptoms date back to a 1984 suicide attempt while undergoing alcohol detoxification. (A.R. 367, 374). He received diagnoses of bipolar disorder in the early 1990s, alcohol dependence in 2003, paranoid schizophrenia in 2006, and depression in 2008 and 2010. (A.R. 53, 307, 367, 434).

Although Sullivan has experienced prolonged periods of sobriety, he has suffered many relapses as well. (A.R. 48, 50, 53, 373, 458, 835, 855). During each relapse, he has stopped taking his anti-depressant and anti-anxiety medications. (A.R. 56). The altercation in the police

department that resulted in the injury to his right wrist occurred during one such relapse.  (A.R. 52, 271, 344).

## B.    Medical Opinion Evidence

Two state agency physicians have completed physical residual-function-capacity assessments concerning Sullivan's wrist injury.  The first, completed on August 31, 2010, by Dr. Beth Schaff, noted that Sullivan was limited in his upper extremities, had chronic swelling and local tenderness over the scapholunate area, and had evidence of radioscaphoid arthritis with joint space narrowing.  (A.R. 380).  She also found that he should avoid concentrated exposure to vibration.  (A.R. 384).  Dr. Schaff opined that he could lift and/or carry twenty pounds occasionally and ten pounds frequently, push and/or pull with some limitation, and occasionally climb ladders, ropes, and scaffolds, and crawl.  (A.R. 381-82).  She also found that he could engage in limited handling activities.  (A.R. 384).

Dr. Theresa Kriston completed a second physical residual-functional-capacity assessment of Sullivan on March 14, 2011.  (A.R. 658).  She reviewed the updated medical record and concluded that he was limited in his upper extremities.  (A.R. 659).  Specifically, she found that his ability to push and pull was limited, and his handling abilities were restricted to occasional grasping and twisting with his right hand.  (A.R. 659-61).  She also noted that he should avoid concentrated exposure to extreme cold, extreme heat, and fumes, odors, dusts, gases, and poor ventilation.  (A.R. 662).  Dr. Kriston agreed with Dr. Schaff that he could occasionally lift or carry twenty pounds, and could frequently lift or carry ten pounds. (A.R. 659).

Dr. Amy Vercillo, a vocational rehabilitation counselor, testified at the June 12, 2012 hearing before the Administrative Law Judge.  (A.R. 60).  Dr. Vercillo identified Sullivan as a

"medium skilled" worker based on his prior work as a carpenter and cabinetmaker. (A.R. 61). She stated that neither position generates skills that would be readily transferrable to another profession. (A.R. 61). Dr. Vercillo testified that an individual with Sullivan's physical limitations as identified by Dr. Schaff and Dr. Kriston would not be able to perform the work necessary to be a carpenter or cabinetmaker. (A.R. 62). Dr. Vercillo opined that an individual with right upper-extremity grasping and twisting limitations would be able to work as an assembly machine tender, of which there are 200,000 positions in the U.S. labor market and 3,5000 in the Massachusetts labor market, a production inspector, of which there are 430,000 positions in the U.S. labor market and 7,300 in the Massachusetts labor market, or as a visual inspector, of which there are 430,000 in the U.S. labor market and 7,300 in the Massachusetts labor market. (A.R. 62).

Ms. Vercillo further testified that an assembly machine tender position involves non-frequent lifting and carrying up to twenty pounds. (A.R. 63). A production inspector position also has non-frequent lifting up to twenty pounds, and may in some settings not be an option for an individual unable to lift more than ten pounds. (A.R. 63, 66). A visual inspector position is primarily sedentary and therefore does not have lifting restrictions. (A.R. 66). Finally, Ms. Vercillo testified that an individual employed as an assembly machine tender, a production inspector, or a visual inspector who misses work more than once per month due to mental health issues and alcohol addiction would likely be unable to keep his or her job. (A.R. 64-65).

C.    **Non-Medical Evidence**

On July 29, 2010, Sullivan submitted a Function Report in which he explained that he showers, eats, walks, goes to the store and the mall, and attends doctor's appointments and A.A.

meetings regularly. (A.R. 207, 211). He reported pain when lifting, twisting, and writing with his right hand. (A.R. 209). In addition, he said that dressing himself is "cumbersome" and that he has to use his left hand to bathe and care for his hair. (A.R. 209). Although he cooks for himself at least twice per day, his injury makes it difficult to lift heavy pots of water and generally slows him down when cooking, doing laundry, or doing the dishes. (A.R. 210).

In a Questionnaire on Pain completed on July 29, 2010, Sullivan noted pain in his right wrist brought on by use or cold temperatures. (A.R. 217-218). He described the pain as "constant but bearable at times," and reported that he takes ibuprofen, wears a brace, and uses heat therapy for pain management. (A.R. 217-218).

In November 2010, Sullivan completed a Disability Report (Form SSA-3441). (A.R. 223). He reported worsening depression due to frustration caused by his wrist injury. (A.R. 223-4). He noted difficulty sleeping due to pain and the financial hardship caused by his inability to work. (A.R. 223-24). He also reported poor concentration and a loss of interest in socializing. (A.R. 224). He reported that those problems prompted his psychiatrist to change his anti-depression medication from Buproprion to Venlafaxine and to increase his dosage. (A.R. 228). He further noted that all tasks had become painful and difficult. (A.R. 228).

On June 12, 2012, Sullivan testified at the oral hearing before the Administrative Law Judge. (A.R. 33). He testified that since his injury in 2006, he has not been able to work consistently or earn enough money to support himself due to his wrist injury. (A.R. 47). He also testified that he performs only isolated work, such as fixing a porch or deck, painting, or snow removal for friends. (A.R. 42-43).

Sullivan further testified that his wrist injury prevents him from performing any motion

with his right hand for an extended period of time.  (A.R. 43-44).  In addition, he experiences

severe pain when lifting heavy objects with his right hand and has a limited range of motion.

(A.R. 44, 57-58).  For pain relief, he stated that he takes ibuprofen and wears a wrist brace at

night.  (A.R. 44).  When the pain is severe, he melts paraffin wax in a melting machine given to

him by the V.A., then dips his hand into the wax to coat it a couple times, and wraps his hand in

a towel.  (A.R. 44-45).  Finally, he testified as to his history of alcohol dependence and mental

disorders.  (A.R. 48-56).  He explained that at the time of his injury he had relapsed, gone off his

medications, and had been arrested for driving under the influence of alcohol.  (A.R. 48-56).

## II.    Procedural History

Sullivan applied for Social Security Disability Insurance (SSDI) and Social Security

Insurance (SSI) benefits on July 22, 2010, alleging an injury onset date of January 15, 2007.

(A.R. 160, 164).  The Acting Commissioner denied his applications on October 1, 2010.  (A.R.

110).  Sullivan moved for reconsideration, and his applications were again denied on March 16,

2011.  (A.R. 118).  He timely filed a request for an oral hearing, which was held on June 12,

2012.  (A.R. 124, 33).  On June 22, 2012, the ALJ issued a decision denying SSDI and SSI

benefits, and finding Sullivan not disabled from the alleged onset date through the date of the

decision.  (A.R. 12).  On August 9, 2012, Sullivan timely filed a request for review by the Social

Security Administration Appeals Council.  (A.R. 10).  On September 11, 2013, the Appeals

Council denied the request for review, and the June 22, 2012 ALJ decision became the final

decision of the Acting Commissioner.  (A.R. 1).  On November 13, 2013, Sullivan filed the

present action with this Court to review the decision of the Acting Commissioner pursuant to 42

U.S.C. § 405(g).  (Pl.'s Compl. at 1).

**III.    Analysis**

**A.    Standard of Review**

Under § 205(g) of the Social Security Act, this Court may affirm, modify, or reverse the Commissioner's decision, with or without remanding the case for a rehearing.  42 U.S.C. § 405(g).  The ALJ's finding on any fact shall be conclusive if it is supported by substantial evidence, and must be upheld "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion," even if the record could justify a different conclusion.  *Rodriguez v. Sec'y of Health and Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981); *see also Evangelista v. Sec'y of Health and Human Servs.*, 826 F.2d 136, 144 (1st Cir. 1987).  In applying the "substantial evidence" standard, the Court must bear in mind that it is the province of the ALJ, not the courts, to find facts, decide issues of credibility, draw inferences from the record, and resolve conflicts of evidence.  *Ortiz v. Sec'y of Health and Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991).  Reversal is warranted only if the ALJ committed a legal or factual error in evaluating plaintiff's claim, or if the record contains no "evidence rationally adequate . . . to justify the conclusion" of the ALJ.  *Roman-Roman v. Commissioner of Social Security*, 114 Fed. Appx. 410, 411 (1st Cir. 2004); *see also Manso-Pizarro v. Sec'y of Health and Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996).

**B.    Standard for Entitlement to Social Security Disability Insurance Benefits**

In order to qualify for SSDI benefits, a claimant must demonstrate that he is disabled within the meaning of the Social Security Act.  The Social Security Act defines a "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be severe enough to prevent the claimant from performing not only his past work, but any substantial gainful work existing in the national economy. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 401.1560(c)(1).

An applicant's impairment is evaluated under a five-step analysis set forth in the regulations promulgated under the statute. 20 C.F.R. § 404.1520. The First Circuit has described the analytical sequence as follows:

> First, is the claimant currently employed? If he is, the claimant is automatically considered not disabled.

> Second, does the claimant have a 'severe impairment' . . . mean[ing] an impairment 'which significantly limits his or her mental capacity to perform basic work-related functions[?]' If the claimant does not have an impairment of at least this degree of severity, he is automatically considered not disabled.

> Third, does the claimant have an impairment equivalent to a specific list of impairments contained in Appendix 1 [of the Social Security regulation]? If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled . . . . If, however, his ability to perform basic work-related functions is impaired significantly (test 2) but there is no 'Appendix 1' impairment (test 3), the [ALJ] goes on to ask the fourth question:

> Fourth, does the claimant's impairment prevent him from performing work of the sort he has done in the past? If not, he is not disabled. If so, the agency asks the fifth question.

> Fifth, does the claimant's impairment prevent him from performing other work of the sort found in the economy? If so, he is disabled; if not, he is not disabled.

*Goodermote v. Sec'y of Health and Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982).

The burden of proof is on the applicant as to the first four steps of the analysis. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the [ALJ] may require."). At the fifth step of the analysis, the burden shifts to the Commissioner to show that the claimant

is capable of performing jobs available in the national economy. *See Goodermote*, 690 F.2d at 7. In making this determination, the ALJ must assess the claimant's RFC in combination with vocational factors, including the claimant's age, education, and work experience. 20 C.F.R. § 404.1560(c).

**C.     The ALJ's Findings**

In evaluating the evidence, the ALJ conducted the five-part analysis called for by Social Security Act regulations. First, the ALJ concluded that plaintiff had not engaged in substantial gainful activity during the period from January 15, 2007, his alleged onset date, through June 22, 2012, the date of the decision. (A.R. at 17-18). Second, the ALJ determined that plaintiff had the following severe impairments: (1) ETOH dependence; (2) depression; (3) generalized anxiety disorder; (4) asthma; and (5) status post wrist fracture. (A.R. at 18). Third, the ALJ concluded that plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (A.R. at 18).

At the fourth step, the ALJ concluded that plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except that he can never climb ladders, ropes or scaffolds; can never crawl; must avoid concentrated exposure to extreme cold, heat, fumes, or irritants; and would be limited to occasional grasping or twisting with the right upper extremity. The ALJ also found plaintiff limited to simple routine tasks, occasional decision making, and occasional changes in the work setting. (A.R. 20)

Given the plaintiff's limitations, the ALJ found plaintiff unable to perform his past relevant work as a carpenter and as a cabinetmaker, as that work requires the performance of

work-related activities precluded by his RFC.  (A.R. at 25).

Finally, at the fifth step, the ALJ concluded that jobs exist in the national economy in significant numbers that plaintiff can perform.  (A.R. 25).  The ALJ expressly relied on the vocational expert's testimony at the hearing that an individual of plaintiff's age, and with his education, work experience, and residual functional capacity, would be able to work as an assembly machine tender, a production inspector, or a visual inspector, and that jobs exist in each of these categories in the national economy in significant numbers.  (A.R. 26).  The ALJ stated that she verified that the vocational expert's testimony was consistent with the information provided in the Dictionary of Occupational Titles concerning the requirements of these jobs.  (A.R. 26).  The ALJ thus concluded that plaintiff is not disabled under section 1614(a)(3)(A) of the Social Security Act.  (A.R. 26-27).

### D.    **Plaintiff's Objections**

Plaintiff raises three objections to the ALJ's findings.  He contends that the ALJ (1) failed to give proper weight to evidence from medical source opinions and made an improper finding as to residual functional capacity; (2) failed to resolve inconsistencies between the vocational expert testimony and the Dictionary of Occupational Titles, as required by SSR 00-4p; and (3) made an improper credibility determination that is not supported by substantial evidence.

### 1.    **Weighing of Medical Evidence and RFC Finding**

Plaintiff contends that the ALJ's RFC determination is not supported by substantial evidence because the ALJ failed to give controlling weight to the findings of his treating physicians.  Specifically, plaintiff points to the reports of Dr. Marvin Rosen, Dr. Olarewaju

Oladipo, Dr. Carlos Cunha, and Dr. George Dyer, and asserts that the ALJ erroneously discounted their opinions in favor of the findings of the state agency physicians.

Plaintiff first contends that the ALJ erred in dismissing Dr. Rosen's reports as being entitled to "little weight," and instead should have considered them substantial evidence from a treating physician. He also contends that the ALJ failed to give sufficiently specific reasons for rejecting Dr. Rosen's reports.

An ALJ's determination of a claimant's residual functional capacity must be supported by substantial evidence. *Seavey v. Barnhart*, 276 F.3d 1, 10 (1st Cir. 2001). Substantial evidence means that there is "more than a mere scintilla" of evidence, such that a reasonable mind could accept the evidence as "adequate to support" the ALJ's conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In making an RFC determination, the opinions of a treating source may be given controlling weight if "the treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *Conte v. McMahon*, 472 F. Supp.2d 39, 48 (D. Mass. 2007). Nevertheless, "the law in this circuit does not require ALJs to give greater weight to the opinions of treating physicians, as she is granted discretion to resolve any evidentiary conflicts of inconsistencies." *Hughes v. Colvin*, 2014 WL 1334170, at *8 (D. Mass. Mar. 28, 2014) (quoting *Arroyo v. Sec'y of Health and Human Servs.*, 932 F.2d 82, 89 (1st Cir. 1991)).

When a treating source's opinion is not given controlling weight, the ALJ must determine the amount of weight to give the opinion based on factors that include (1) the length of the

treatment relationship, (2) whether the treating source provided evidence in support of the opinion, (3) whether the opinion is consistent with the record as a whole, and (4) whether the treating source is a specialist. 20 C.F.R. § 404.1527(c). The ALJ must "give good reasons in her notice of determination or decision for the weight [she gives the] treating source's opinion," and should not discount that opinion entirely. *Id*. However, opinions that a claimant is "disabled or unable to work" are legal conclusions "reserved to the Commissioner because they are administrative findings that are dispositive of a case." 20 C.F.R. § 404.1527(d)(1).

The ALJ did not give Dr. Rosen's opinion controlling weight for two reasons. First, she found that Dr. Rosen's opinion was "not supported by the medical evidence of record including the claimant's medical treatment notes, the objective medical findings, or even the claimant's subjective allegations." (A.R. 24). Substantial evidence supports that determination. Specifically, there is objective medical evidence demonstrating that plaintiff has a healed wrist fracture and normal EMG and nerve conduction test results. (A.R. 715-716, 824-25). The ALJ also accepted Dr. Rosen's medical-treatment notes that suggest radioscaphoid arthritis, posttraumatic arthritis, sclerosis, limited range of motion, decreased grip strength, and tenderness. (A.R. 20-21, 275, 325-26, 366, 586, 666, 824-25). She also accepted Dr. Rosen's subjective finding that plaintiff's symptoms would worsen with repetitive use of his wrist and that he could not return to work as a carpenter. (A.R. 21, 24, 366). However, the medical treatment notes, including those from Dr. Rosen, show that plaintiff's pain arises from repetitive work activity (for example when he uses a hammer or nail gun, or hangs shingles) and can be reduced with ibuprofen and a paraffin wax treatment machine. (AR 22-23, 43-44, 57-58, 366, 721, 812, 856).

Likewise, Dr. Rosen's opinion was inconsistent with the residual functional capacity assessments completed by Dr. Beth Schaff and Dr. Theresa Kriston, who both found that plaintiff has a light residual functional capacity while being limited in the use of his right upper extremity. (A.R. 24, 381-82, 384, 659-61); *see also Conte*, 472 F. Supp. 2d at 48 ("the hearing officer may opt not to give controlling weight to the treating source if the hearing officer finds the doctor's opinion inconsistent with other substantial evidence in the record"). Dr. Rosen's opinion of total disability was also inconsistent with testimony from the vocational expert that plaintiff can engage in certain work in the economy. (A.R. 24). Finally, plaintiff's self-completed Function Report and Questionnaire on Pain reveal that he is able to carry out daily activities, albeit with some limitations, and manages his pain with ibuprofen, a wrist brace, and paraffin wax treatment. (A.R. 207, 209, 211, 217-218 ).

Because the ALJ cited substantial evidence in the record that was contrary to, or at least inconsistent with, Dr. Rosen's opinion, the ALJ fulfilled her burden under 20 C.F.R. § 404.1527(d)(2) to provide valid reasons for affording diminished weight to those opinions. *See Conte*, 472 F. Supp. 2d at 49 ("[s]ubstantial evidence exists for the hearing officer's decision to weigh consistency as the dispositive factor in diminishing the weight of [treating physician's] evaluation.").

Second, the ALJ properly declined to give controlling weight to Dr. Rosen's assertion that plaintiff is "permanently unable to work." That determination is expressly reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(1). Dr. Rosen's opinion that plaintiff is permanently disabled is thus not entitled to any weight as a matter of law.

Next, plaintiff contends that the ALJ failed to consider and give sufficient weight to the

findings of treating physician Dr. Oladipo.  Dr. Oladipo saw plaintiff five times for his wrist injury from October 2008 to March 2010.  (A.R. 311, 314, 316, 318, 320, 322).  On May 30, 2010, he noted that plaintiff had "chronic persistent pain affecting the right wrist" indicative of "residual disability."  (A.R. 314-315).

Although an ALJ may not ignore evidence, there is no requirement for an ALJ to "expressly refer to each document in the record, piece-by-piece." *Rodriguez v. Sec'y of Health and Human Servs.,* 915 F.2d 1557, 1990 WL 152336, at *1 (1st Cir. Sep. 11, 1990).  *See also Lord v. Apfel*, 114 F. Supp.2d 3, 13 (D.N.H. 2000) ([T]he First Circuit has held that an ALJ's written decision need not directly address every piece of evidence in the administrative record.").

In this case, the ALJ clearly discussed and accepted Dr. Oladipo's findings from his examinations of plaintiff on September 23, 2008, and November 7, 2009.  (A.R. 21).  The ALJ was not required to mention Dr. Oladipo's findings from each appointment, especially where the findings were substantially the same as those that the ALJ did discuss.

Furthermore, although the ALJ did not mention Dr. Oladipo by name, and did not expressly accept or reject his opinions, she clearly considered them and found them inconsistent with the medical record as a whole.  Specifically, Dr. Oladipo's opinion that plaintiff suffers from "chronic persistent pain" is inconsistent with plaintiff's normal sensory nerve conduction test results, medical-treatment notes indicating that the pain mainly arises when plaintiff works, and plaintiff's own function report regarding his daily activities.  The ALJ acknowledged that plaintiff has "severe" impairments, but found that based on the record as a whole, those impairments do not preclude plaintiff from engaging in all forms of work.  (A.R. 23-24).

Plaintiff cites to several Ninth Circuit opinions that require an ALJ to afford greater weight to the opinion of a treating physician than to that of a consulting physician and, further, to provide "'specific and legitimate reasons' supported by substantial evidence in the record" upon rejecting the opinion of a treating physician. *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995) (citing *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983)). However, in the First Circuit, "it is well settled that even the opinions of treating physicians are not entitled to greater weight merely because they are treating physicians." *Rodriguez-Gonzalez v. Astrue*, 854 F. Supp. 176, 184 (D.P.R. 2012) (citing *Rodríguez Pagan v. Sec'y of Health and Human Servs.*, 819 F.2d 1, 3 (1st Cir. 1987) ("The opinions of [named doctors] are not entitled to greater weight merely because they were treating physicians, whereas [named doctor] was a consulting physician."). Furthermore, it is possible to discern that Dr. Oladipo's opinion was disregarded where it conflicted with the evidence cited in support of the ALJ's decision. While the ALJ could have explained her reasoning more clearly, the ALJ's implicit decision to reject Dr. Oladipo's findings is supported by substantial evidence.

Finally, the ALJ properly declined to give Dr. Oladipo's assessment of "residual disability" controlling weight because, again, that determination is expressly reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(1).

Plaintiff further contends that the ALJ failed to make specific reference to, and give adequate weight to, the opinions of his radiologist, Dr. Cunha. Dr. Cunha examined plaintiff and took x-rays on March 13 and June 12, 2008. Dr. Cunha concluded that he had "increased sclerosis in the scaphoid bone, possibly representing avascular necrosis." (A.R. 274-5).

First, the ALJ referred to plaintiff's x-ray results from both March 13 and June 12, 2008,

although she did not mention Dr. Cunha by name. (A.R. 20-21). In fact, the ALJ accepted Dr. Cunha's findings that the x-rays showed a "transverse fracture through the waist of the scaphoid, a single metallic screw across the fracture site, sclerosis involving the scaphoid bone compatible with avascular necrosis and deformity of the fifth metacarpal consistent with prior fracture." (A.R. 20-21). She considered the x-ray results to constitute objective medical evidence that supported her conclusion. (A.R. 20). Second, the ALJ was not required to specifically refer to each of Dr. Cunha's reports, as those not mentioned were cumulative of the reports the ALJ discussed. See *Rodriguez*, 1990 WL 152336, at *1.

Finally, plaintiff contends that the ALJ failed to give controlling weight to the findings of Dr. Dyer. Dr. Dyer saw plaintiff in January and August 2011. Dr. Dyer found that plaintiff had a "scaphoid fracture status post nonunion repair, with good healing but with suggestion of radioscaphoid arthritis," "suggestion of proximal avascular necrosis," and "possible ulnar neuropathy." (A.R. 586). Dr. Dyer also found that plaintiff "has limited motion of the wrist," "discomfort when deviating it radially," "fairly constant numbness," and "sensitivity of the ulnar nerve in the retro-epicondylar groove." (A.R. 586).

Again, the ALJ is not required to mention every piece of evidence in the record, especially where the evidence is cumulative or fails to support plaintiff's position. *See Coggon v. Barnhart*, 354 F. Supp. 2d 55 (D. Mass. 2005). Here, the ALJ mentioned Dr. Dyer's diagnosis of a right scaphoid nonunion, and his suggestion of surgical intervention that plaintiff declined. (A.R. 21). Overall, the ALJ did not actually reject Dr. Dyer's opinions. Rather, she accepted his findings as objective medical evidence and used them to support her RFC assessment.

In conclusion, the ALJ's stated reasons for not affording controlling weight to Dr. Rosen,

Dr. Oladipo, Dr. Cunha, and Dr. Dyer are well-supported by record evidence. The ALJ's

residual functional capacity finding therefore will not be reversed.

### 2. Alleged Inconsistencies Between the Vocational Expert Testimony and the Dictionary of Occupational Titles

Next, plaintiff contends that the ALJ did not resolve conflicts between the vocational

expert's testimony and the Dictionary of Occupational Titles (DOT), and therefore did not

comply with SSR 00–4p. Specifically, plaintiff contends that the vocational expert's testimony

that an individual with his limitations can perform work as a visual inspector, assembly-machine

tender, or production inspector is inconsistent with the DOT's functional requirements for those

positions. According to plaintiff, the ALJ's failure to recognize the discrepancies and seek an

explanation from the vocational expert leaves the ALJ's disability determination unsupported by

substantial evidence.

The Commissioner does not dispute the fact that a conflict exists between the expert's

testimony that plaintiff could perform work as a production inspector or a visual inspector and

the DOT's functional requirements for those positions. The DOT lists "handling" as occurring

"constantly" for each of these positions. *See DOT* No. 741.687-010, 1991 WL 680249 (1991)

(production inspector); *DOT* No. 726.684-050, 1991 WL 679601 (1991) (visual inspector).

However, the Commissioner contends that no such conflict exists between the expert's testimony

that plaintiff can work as an assembly-machine tender and the DOT. According to the DOT, an

assembly-machine tender position only requires occasional handling, which plaintiff's RFC

allows. *DOT* No. 754.685-014, 1991 WL 680374 (assembly-machine tender).

In order to find a claimant not disabled at step five, the Commissioner has the burden of

establishing that there is work existing in significant numbers in the national economy that

plaintiff can perform with his RFC. 20 C.F.R. §§ 404.1520(a), 404.1520(g), 404.1560(c),

416.920(a), 416.920(g), 416.960(c).

The applicable regulation, SSR 00-4p, provides:

Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

Neither the DOT nor the VE or VS evidence automatically 'trumps' when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information.

SSR 00–4p. *See also Szumylo v. Astrue*, 815 F. Supp. 2d 434, 440 (D. Mass. 2011)

SSR 00–4p thus makes clear that an ALJ need only resolve conflicts between evidence

provided by a vocational expert and the DOT when the inconsistency is apparent and has been

identified. SSR 00–4p, 2000 WL 1898704, at *2 (S.S.A. Dec. 4, 2000) ("When there is an

apparent unresolved conflict between [vocational expert] evidence and the DOT, the adjudicator

must elicit a reasonable explanation . . . ."); *see also Donahue v. Barnhart,* 279 F.3d 441, 446

(7th Cir. 2002) (SSR 00–4p "requires an explanation only if the discrepancy was

'identified' . . . ."); *Carey v. Apfel,* 230 F.3d 131, 146–47 (5th Cir. 2000) ("[C]laimants should

not be permitted to scan the record for implied or unexplained conflicts between the specific

testimony of an expert witness and the voluminous provisions of the DOT, and then present that

conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial

development in the administrative hearing.").

In this case, there is no indication that plaintiff's attorney objected to the expert's testimony or identified the discrepancy at the oral hearing. (A.R. 63-64). Because the inconsistency was not identified during the hearing, the ALJ was not required to explain the conflict. *See Aho v. Comm'r of Soc. Sec. Admin.*, 2011 WL 3511518, at *14 (D. Mass. Aug. 10, 2011); *see also Donahue,* 279 F.3d at 447 ("Raising a discrepancy only after the hearing, as Donahue's lawyer did, is too late. An ALJ is not obliged to reopen the record."); *Carey,* 230 F.3d at 147 (accepting vocational expert's testimony, in part, because the testimony was unchallenged). Therefore, even assuming a conflict, there was no violation of SSR 00–4p.

In her decision, the ALJ did not address the apparent discrepancy between plaintiff's RFC and the DOT's job function descriptions for production inspector and visual inspector. She instead stated that "[p]ursuant to SSR 00–04p, I have determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles." (A.R. 26). However, with regard to those two positions, that is simply not true. The ALJ should have resolved the conflict before she relied on the expert's testimony that plaintiff can perform those two jobs. Without such a resolution, there is insufficient evidence to conclude that plaintiff is able to perform the positions of production inspector and visual inspector .

However, there is no conflict between the DOT's functional requirements for the assembly-machine tender position and plaintiff's RFC. The position of assembly-machine tender requires only "occasional" handling. *DOT* No. 754.685-014, 1991 WL 680374 (assembly-machine tender). The vocational expert testified that an individual with plaintiff's RFC can perform work as an assembly-machine tender, and that there are 200,000 such jobs in the U.S. labor market and 3,5000 in the Massachusetts labor market. (A.R. 62). *See Edwards v.*

*Sec'y of Health & Human Servs.,* No. 94–1345, 1994 WL 481140, at *2 (1st Cir. Sept.2, 1994) (unpublished) (finding that 67,500 jobs in the national economy was sufficient to satisfy the Commissioner's burden of proof). An ALJ need not identify more than one job that the claimant can perform. 20 C.F.R. § 404.1566; *see also Wilson v. Astrue*, 2010 WL 1379889, at *8 (D. Mass. Mar. 30, 2010). Although plaintiff contends that the position actually requires more than occasional handling, based on the DOT's activities description of an assembly-machine tender, there is no basis in the record for that claim. The Court thus finds that the commissioner has satisfied the burden of proving that significant works exists in the economy that plaintiff can perform.

### 3. <u>The ALJ's Credibility Determination as to Plaintiff's Subjective Pain Allegations</u>

Finally, plaintiff contends that the ALJ made an improper credibility determination by finding his subjective allegations of pain not credible. He contends that the ALJ did not provide sufficiently specific findings to support her credibility determination. He further contends that the ALJ overestimated his ability to manage his pain through ibuprofen and paraffin wax therapy, and that the ALJ inappropriately equated his ability to conduct daily activities with an ability to engage in gainful employment.

The ALJ is responsible for deciding "issues of credibility" and drawing "permissible inference[s] from evidentiary facts." *Rodriguez*, 647 F.2d at 222 (quoting *Rodriguez v. Celebrezze*, 349 F.2d 494, 496 (1st Cir. 1965)). Furthermore, "[t]he credibility determination by the ALJ, who observed the claimant, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference . . . ." *Frustaglia v. Sec'y of Health & Human Servs.*, 829 F.2d 192, 195 (1st Cir. 1987) (citing *DaRosa v. Sec'y of Health & Human*

*Servs.*, 803 F.2d 24, 26 (1st Cir. 1986)).  An ALJ may find that a claimant's testimony is not credible if the ALJ supports such a conclusion with "substantial evidence" and makes specific findings as to the "relevant evidence" considered in coming to that conclusion.  *DaRosa*, 803 F.2d 26.

In evaluating a plaintiff's credibility, the alleged functional limitations and restrictions due to symptoms must be reasonably consistent with medical evidence and other evidence, including statements and reports by the claimant and treating sources.  20 C.F.R. § 404.1529. Factors that should be considered in assessing the severity of claimant's complaints of pain include daily activities; location, duration, frequency, and intensity of symptoms; type, dosage, effectiveness, and side effects of medication; and treatment or any other measures used to relieve symptoms. *Id.*; *see also Avery v. Sec'y of Health & Human Servs.*, 797 F.2d 19, 29 (1st Cir. 1986).  However, an ALJ is not required to discuss specifically all those factors in making a decision.  *Deforge v. Astrue*, 2010 WL 3522464, at *9 (D. Mass. Sept. 9, 2010).

Here, the ALJ found that "claimant's statements concerning the intensity, persistence and limiting effects of [his] symptoms are not credible to the extent they are inconsistent with the [ . . . ] residual functional capacity assessment."  (A.R. 23).  The ALJ considered and discussed the *Avery* factors and requirements of 20 C.F.R. 404.1529(c) at the hearing and in her written decision.  During the hearing, plaintiff testified as to the nature, location, and severity of pain that he experienced.  He testified, "I can't constantly do something with the hand for a long period of time," and that his pain is brought on by "continual" use of his hand. (A.R. 43-44). Moreover, he stated "if I pick up anything heavy the pain just goes through the roof."  (A.R. 44). But, "if I just relax right now with my hand like this I'm okay . . . ."  (A.R. 57).

In her decision, the ALJ noted that plaintiff's claims regarding his inability to work went far beyond what is detailed in the objective medical evidence and the record as a whole. (A.R. 23). She found that his claims of disability did not align with his self-completed Function Report that detailed his ability to carry out daily living activities. (A.R. 23). The ALJ also cited treatment notes from the medical record that demonstrate that his pain "only increases when he repeatedly uses his wrist for work activity" and "can be reduced through the use of his paraffin machine and ibuprofen." (A.R. 23). The ALJ thus sufficiently explored the *Avery* factors and made a credibility determination that was adequately supported by references to the medical record and plaintiff's own testimony.

Plaintiff's contention that the ALJ overstated his ability to reduce his pain through various home treatments is not persuasive. The medical treatment notes, plaintiff's Function Report, and his testimony at the hearing all indicate that his pain generally arises with repetitive use of his hand and can be reduced by various home remedies. For example, Dr. Rosen's treatment notes indicate that plaintiff reported being able to relieve his pain by taking Motrin. (A.R. 366). Likewise, in his 2010 Function Report, plaintiff reported pain when lifting, twisting, and writing with his right hand. (A.R. 209). In his self-completed Questionnaire on Pain, he noted pain in his right wrist brought on by use or cold temperatures. (A.R. 217-218). He described the pain as "constant but bearable at times," and reported that he takes ibuprofen, wears a brace, and uses heat therapy for pain management. (A.R. 217-218). Finally, he testified at his oral hearing that he takes ibuprofen and uses a paraffin wax machine for pain management. (A.R. 44). He also testified that he wears a brace at night to reduce the pain while he sleeps. (A.R. 44).

Plaintiff also contends that his homelessness currently prevents him from using the wax machine and his ability to manage his pain is therefore limited. The ALJ questioned him about that issue at the hearing. (A.R. 45). Plaintiff testified that he did not use the machine due to his homelessness and instead takes ibuprofen and uses his wrist brace. (A.R. 45-46). He testified that without the wax machine, the ibuprofen does not eliminate his pain, but rather only reduces it. (A.R. 57). He further testified that he needed only two ibuprofen on the day of the hearing, but on other days he takes up to four. (A.R. 57). Based on that discussion, the ALJ clearly considered his homelessness as a factor related to his ability to manage his pain. Her determination of "how that testimony fit in with the rest of the evidence, is entitled to deference[.]" *Frustaglia*, 829 F.2d 195. The ALJ's decision that his allegations of pain were not credible to the extent that they conflicted with the RFC assessment was thus a reasonable conclusion based on plaintiff's testimony and the record as a whole.

Finally, plaintiff's contention that the ALJ erred because she assumed that his ability to engage in daily activities translated into an ability to engage in gainful employment is without merit for two reasons. First, the ALJ only used plaintiff's reports of his daily activities in her discussion of the *Avery* factors, which direct the ALJ to assess claimant's ability to engage in daily activities. His Function Report and statements of his daily activities were used solely to contradict his own allegations of limitations as to those daily activities, not to contradict his allegations regarding his ability to work. (A.R. 23). Second, the ALJ concluded that plaintiff "does have an impairment that more than minimally impairs [his] ability to perform work-related activities." (A.R. 24). She therefore accounted for his credible pain and the restrictions imposed by his wrist injury. However, she found that his impairment did not preclude him from engaging

in all forms of employment.  (A.R. 24).  Thus, the ALJ's residual functional capacity assessment reasonably balances plaintiff's pain allegations and the medical record as a whole.  Accordingly, the Court finds that the ALJ's findings as to plaintiff's credibility were not improper or unfounded.

IV.     **Conclusion**

For the foregoing reasons, plaintiff's motion to reverse the decision of the Commissioner is DENIED, and the Commissioner's motion to affirm is GRANTED.

**So Ordered.**


                                        /s/ F. Dennis Saylor
                                        F. Dennis Saylor IV
                                        United States District Judge
Dated: March 24, 2015